1 Bruce J. Wecker (SBN 78530)
Christopher L. Lebsock (SBN 184546)
2 **HAUSFELD LLP**
44 Montgomery Street, Suite 3400
3 San Francisco, CA 94104
Tel: (415) 633-1908
4 Fax: (415) 358-4980

5

*Attorneys for Plaintiff*
6 *TriStrata, Inc.*

7                         UNITED STATES DISTRICT COURT

8                         NORTHERN DISTRICT OF CALIFORNIA

9 TRISTRATA, INC., a California corporation          Case No.: **CV 11 3797**

            Plaintiff,
10
11          vs.                                       **ORIGINAL COMPLAINT**
                                                      **FOR PATENT INFRINGEMENT**
12
13 MICROSOFT CORPORATION, a Washington
   Corporation;                                       **DEMAND FOR JURY TRIAL**
14
15          and
16
17 ADOBE SYSTEMS INCORPORATED, a
   Delaware Corporation;
18
            Defendants.
19

20                      **ORIGINAL COMPLAINT**

21          Plaintiff TriStrata, Inc. ("Plaintiff" or "TriStrata"), files this Original Complaint for patent

22 infringement against Microsoft Corporation ("Microsoft") and Adobe Systems Incorporated

23 ("Adobe") (collectively "Defendants") alleging as follows:

24          1.       TriStrata owns a portfolio of patents arising from its path-breaking work in the area

25 of securing data transmitted over open networks. This Complaint concerns patents directed at the

26 protection and management of encryption keys that seal information to protect it from copying or

27

28

ORIGINAL COMPLAINT FOR                                              Case No.:
PATENT INFRINGEMENT

1    organized under the laws of the State of Washington. Microsoft is doing business in California,

2    and has its principal place of business in Redmond, Washington.

3        8.    Defendant Adobe Systems, Incorporated ("Adobe"), on information and belief, is a

4    corporation organized and existing under the laws of the state of Delaware, with a principal place

5    of business at 345 Park Avenue, San Jose, California.

6                          **JURISDICTION & VENUE**

7        9.    This is an action for infringement of a United States patent.  Accordingly, this

8    action arises under the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*, and

9    jurisdiction is properly based on 35 U.S.C. § 271 and 28 U.S.C. § 1338(a).

10       10.   Venue is proper in this district under 28 U.S.C. §§ 1391(b-c) and 1400(b).  Upon

11   information and belief, each of the Defendants transacts or has transacted business in this judicial

12   district, or committed and/or induced acts of patent infringement in this district.

13                          **FACTUAL BACKGROUND**

14       11.   TriStrata was founded in 1996, by Dr. Martin (John) M. Atalla, a preeminent

15   engineer and inventor who is widely known as the "Father of the PIN," acknowledging his role in

16   the development of the Personal Identification Number system in Automated Teller Machine

17   ("ATM") information security management. Dr. Atalla was inducted into the National Inventors

18   Hall of Fame in 2009.  Dr. Atalla formed TriStrata to develop an end-to-end solution for sending

19   documents over insecure networks such as the Internet.  The TriStrata Enterprise Security Server

20   ("TESS") provided secure management of encryption keys through an innovative architecture of

21   "seals" and "permits." TriStrata recognized the need to build a new system from the ground up,

22   protecting information throughout its lifecycle, and regardless of whether the information was in

23   storage, at rest, in motion, and during use. The controlled accessibility of information must be

24   ensured through protection that is integrated with the information itself.

25       12.   By 1999, TriStrata had 125 employees and was working with Price Waterhouse,

26   and a number of Fortune 500 companies testing its system. In late 1999, Steven Ballmer arranged

27   for a meeting in Redmond, Washington among TriStrata's Dr. Atalla, Donald S. Adams, another

28

-3-

1  of the inventors of the Patents-in-Suit, and Microsoft's senior Windows and security executives

2  and engineers. At the meeting, TriStrata presented its patented security server technology to

3  Microsoft with detailed discussion of the network architecture and implementation details that

4  provided a scalable system for key management and protection.

5          13.     Today, TriStrata continues to develop and market its server product.

6          14.     On August 14, 2007, United States Patent No. 7,257,706 ("the '706 patent")

7  entitled "Method of securing a document in a system and controlling access to the document and a

8  seal for use in the method" was duly and legally issued.  TriStrata holds the title by assignment

9  from the inventors Daniel F. Zucker, Martin M. Atalla, and Donald S. Adams, including the right

10  to sue for past, present and future damages.  A copy of the '706 patent is attached as Exhibit A.

11          15.     On June 22, 2010, United States Patent No. 7,743,249 ("the '249 patent") entitled

12  "Method of securing a document in a system and controlling access to the document and a seal for

13  use in the method" was duly and legally issued.  TriStrata holds the title by assignment from the

14  inventors Daniel F. Zucker, Martin M. Atalla, and Donald S. Adams, including the right to sue for

15  past, present and future damages.  A copy of the '249 patent is attached as Exhibit B.

16          16.     The '706 and '249 patents are directed to methods of securing electronic documents

17  in computer networks whether the document is in storage or is sent in communication or is shared

18  anywhere within the computer system or network.  Security can be provided for the information

19  even after the document has been widely distributed, whether the distribution was by accident or

20  through a fraudulent hacker. This is done through the provision by a security server of a "seal"

21  containing information necessary to retrieve a decryption key along with policy information on

22  who may have access to the document and under what constraints.

23          17.     Pursuant to 35 U.S.C. § 282, the '706 and '249 patents are presumed valid.

24          18.     Each of the Defendants sells and distributes software products providing customers

25  with Information Rights Management (IRM) or Enterprise Digital Rights Management (E-DRM)

26  systems.

27          19.     On information and belief, Microsoft has since the introduction of Windows Server

28

-4-

ORIGINAL COMPLAINT FOR                                                           Case No.:
PATENT INFRINGEMENT

2003, provided customers with a service that allows Office and other documents, to encrypt them and limit others access and permissions, by use of server-generated "seals." This feature was initially referred to as Windows Rights Management Services.  As the product has expanded and changed features, its enterprise version has been renamed as Active Directory Rights Management Services ("AD RMS").  Microsoft also provides its Windows Live users with a hosted service that allows them to secure documents they send over the internet.

20.    Client applications must be enabled to work with the server in encrypting and decrypting documents and in applying permissions granted by the document owner.  Microsoft has offered such client software, first as a free download, and now, beginning with Windows Vista and Windows 7, as a part of each copy of Windows that it distributes.

21.    Microsoft Outlook, using the security provided by Microsoft's RMS, for example, provides the user the option to send email with a "Do Not Forward" protection which prevents the recipient from further distributing the message in a readable form.

22.    Similarly, a company employee can protect company secrets in a financial spreadsheet by distributing a document to his team without allowing access to anyone else, and can revoke the permission at any time since the AD RMS server must be contacted before anyone is allowed access to the document

23.    Microsoft, by the distribution of its Windows Server and Client products and its distribution of Office applications software has infringed and continues to infringe, contribute to the infringement of, or induce the infringement of at least claim 1  of the '706 and '249 patents, either literally or under the doctrine of equivalents.

24.    Microsoft's acts of infringement of the '706 and '249 patents, as alleged above, have injured Plaintiff and, thus, Plaintiff is entitled to recover damages adequate to compensate it for Microsoft's acts of infringement, which in no event can be less than a reasonable royalty.

25.    On information and belief, Microsoft has known of TriStrata's patents, patent applications and its claim for patent protection at least since the parties met in late 1999.  It nonetheless developed its infringing products using the ideas disclosed in that meeting and in the

ORIGINAL COMPLAINT FOR
PATENT INFRINGEMENT

1  TriStrata patents.



26.     Adobe Flash Media Rights Management Server works in combination with Adobe LiveCycle Rights Management ES to provide secure access to flash video files.

27.     By making, operating, using and/or selling its LiveCycle Rights Management ES and Flash Media Rights Management Server software, Adobe has infringed and continues to infringe, contribute to the infringement of, or induce the infringement of at least claim 1 of the '706 and '249 patents, either literally or under the doctrine of equivalents.

28.     Adobe's acts of infringement of the '706 and '249 patents, as alleged above, have injured Plaintiff and thus, Plaintiff is entitled to recover damages adequate to compensate it for Adobe's acts of infringement, which in no event can be less than a reasonable royalty.

<u>COUNT I</u>
**(Microsoft's Patent Infringement)**

29.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 28

-6-

ORIGINAL COMPLAINT FOR
PATENT INFRINGEMENT

Case No.:

above.

30.    TriStrata is the owner of the '706 and '249 Patents.

31.    Microsoft has infringed and is still infringing the '706 and '249 Patents, by, without authority, consent, right or license, and in direct infringement of the patents, making, using, offering for sale and/or selling digital information transfer products using the methods, processes and apparatuses claimed in the patent in this country.  This conduct constitutes infringement under 35 U.S.C. § 271(a).

32.    In addition, Microsoft has infringed and is still infringing the '706 and '249 Patents in this country, through, inter alia, its active inducement of others to make, use, and/or sell the systems, products and methods claimed in one or more claims of the patent.  This conduct constitutes infringement under 35 U.S.C. § 271(b).

33.    In addition, Microsoft has infringed and is still infringing the '706 and '249 Patents in this country through, inter alia, providing and selling goods and services including products designed for use in practicing one or more claims of the '706 and '249 Patents, where the goods and services constitute a material part of the invention and are not staple articles of commerce, and which have no use other than infringing one or more claims of the '706 and '249 Patents. Microsoft has committed these acts with knowledge that the goods and services it provides are specially made for use in a manner that directly infringes the '706 and '249 Patents.  This conduct constitutes infringement under 35 U.S.C. § 271(c).

34.    Microsoft's infringing conduct is unlawful and willful.  Defendant Microsoft's willful conduct makes this an exceptional case as provided in 35 U.S.C. § 285.

35.    As a result of Microsoft's infringement, Plaintiff has been damaged, and will continue to be damaged, until they are enjoined from further acts of infringement.

36.    Microsoft will continue to infringe the '706 and '249 Patents unless enjoined by this Court.  Plaintiff faces real, substantial and irreparable damage and injury of a continuing nature from Defendant Microsoft's infringement for which Plaintiff has no adequate remedy at law.

-7-

ORIGINAL COMPLAINT FOR
PATENT INFRINGEMENT

Case No.:

## COUNT II
### (Adobe's Patent Infringement)

37.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 28 above.

38.     TriStrata is the owner of the '706 and '249 Patents.

39.     Adobe has infringed and is still infringing the '706 and '249 Patents, by, without authority, consent, right or license, and in direct infringement of the patents, making, using, offering for sale and/or selling digital information transfer products using the methods, processes and apparatuses claimed in the patent in this country.  This conduct constitutes infringement under 35 U.S.C. § 271(a).

40.     In addition, Adobe has infringed and is still infringing the '706 and '249 Patents in this country, through, inter alia, its active inducement of others to make, use, and/or sell the systems, products and methods claimed in one or more claims of the patent.  This conduct constitutes infringement under 35 U.S.C. § 271(b).

41.     In addition, Adobe has infringed and is still infringing the '706 and '249 Patents in this country through, inter alia, providing and selling goods and services including products designed for use in practicing one or more claims of the '706 and '249 Patents, where the goods and services constitute a material part of the invention and are not staple articles of commerce, and which have no use other than infringing one or more claims of the '706 and '249 Patents.  Microsoft has committed these acts with knowledge that the goods and services it provides are specially made for use in a manner that directly infringes the '706 and '249 Patents.  This conduct constitutes infringement under 35 U.S.C. § 271(c).

42.     As a result of Adobe's infringement, Plaintiff has been damaged, and will continue to be damaged, until they are enjoined from further acts of infringement.

43.     Adobe will continue to infringe the '706 and '249 Patents unless enjoined by this Court.  Plaintiff faces real, substantial and irreparable damage and injury of a continuing nature from Defendant Microsoft's infringement for which Plaintiff has no adequate remedy at law.

-8-

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for entry of judgment:

A.    declaring that Defendants have infringed one or more claims, specifically including claim 1, of the '706 and '249 patents;

B.    that Defendants be permanently enjoined from further infringement, including contributory infringement and/or inducing infringement, of the Patents-in-Suit, or in the alterative awarding a royalty for post-judgment infringement;

C.    that Defendants account for and pay to Plaintiff all damages caused by their infringement of the '706 and '249 patents, which by statute can be no less than a reasonable royalty;

D.    that Plaintiff be granted pre-judgment and post-judgment interest on the damages caused to it by reason of Defendants infringement of the '706 and '249 patents;

E.    that Defendant Microsoft's infringement of the TriStrata Patents be adjudged willful and that the damages to Plaintiff be increased by three times the amount found or assessed pursuant to 35 U.S.C. § 284;

F.    that this be adjudged an exceptional case and that Plaintiff be awarded its attorney's fees in this action pursuant to 35 U.S.C. § 285;

G.    that costs be awarded to Plaintiff; and

H.    that Plaintiff be granted such other and further relief as the Court may deem just and proper under the current circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff, by its undersigned attorneys, demands a trial by jury on all issues so triable.


Dated:  August 1, 2011                          Respectfully submitted,


                                                By: _____
                                                    BRUCE J. WECKER (SBN 78530)

ORIGINAL COMPLAINT FOR
PATENT INFRINGEMENT                                              Case No.:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Christopher L. Lebsock (SBN 184546)
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel:  (415) 633-1908
Fax:  (415) 358-4980

*Attorneys for Plaintiff TriStrata, Inc.*

4818-3523-0474

-10-

ORIGINAL COMPLAINT FOR
PATENT INFRINGEMENT

Case No.:

**EXHIBIT  A**

US007257706B1

## (12) United States Patent
### Zucker

(10) Patent No.: **US 7,257,706 B1**
(45) Date of Patent: **Aug. 14, 2007**

(54) **METHOD OF SECURING A DOCUMENT IN A SYSTEM AND CONTROLLING ACCESS TO THE DOCUMENT AND A SEAL FOR USE IN THE METHOD**

(75) Inventor: **Daniel F. Zucker**, Palo Alto, CA (US)

(73) Assignee: **TriStrata Security, Inc.**, Redwood Shores, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/123,751**

(22) Filed: **May 6, 2005**

### Related U.S. Application Data

(63) Continuation of application No. 09/370,384, filed on Aug. 9, 1999, now Pat. No. 6,912,655.

(51) Int. Cl.
*H04L 9/08* (2006.01)
*H04K 1/00* (2006.01)

(52) **U.S. Cl.** ...................................... 713/163; 713/181

(58) **Field of Classification Search** ................. 713/181, 713/179, 163; 380/279
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,607,137 A | 8/1986 | Jansen |
| 4,679,236 A | 7/1987 | Davies |
| 4,853,962 A | 8/1989 | Brockman |

(Continued)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 4243908 A1 | 6/1994 |

(Continued)

#### OTHER PUBLICATIONS

McGovern, T., "Varying Encryption Keys for a Single Call," Motorola Technical Developments, vol. 24, Mar. 1995, pp. 61-62.

(Continued)

*Primary Examiner*—Matthew Smithers
(74) *Attorney, Agent, or Firm*—Alan H. MacPherson; MacPherson Kwok Chen & Heid LLP

(57) **ABSTRACT**

An efficient multicast key management is achieved by using seals. A security server generates a seal. In one embodiment, the seal contains a key. In another embodiment, the seal contains information for generating a key. An application server requests the seal from the security server and broadcasts the seal to a plurality of recipients. A recipient wishing to encrypt or decrypt a data stream transmits the received seal to the security server to be opened. If the recipient is authorized, the security server transmits a permit to the authorized recipient. In one embodiment, the recipient generates a key from the permit. In another embodiment, the permit is the key. If the recipient is a sender, the recipient encrypts data using the key and broadcasts the same encrypted data stream to all receivers. If the recipient is a receiver, the recipient decrypts an encrypted data stream using the key. In one embodiment, a seal with a corresponding offset value is sent periodically in a data stream. In another embodiment, multiple instances of identical seals are opened only once. In yet another embodiment, a seal is appended to each datagram packet. In a further embodiment, a seal is appended to any data stream.

**29 Claims, 5 Drawing Sheets**



# US 7,257,706 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,878,246 A | 10/1989 | Pastor et al. | |
| 4,972,472 A | 11/1990 | Brown et al. | |
| 4,991,087 A | 2/1991 | Burkowski et al. | |
| 5,081,677 A | 1/1992 | Green et al. | |
| 5,115,467 A | 5/1992 | Esserman et al. | |
| 5,120,939 A | 6/1992 | Claus et al. | |
| 5,199,073 A | 3/1993 | Scott | |
| 5,245,658 A | 9/1993 | Bush et al. | |
| 5,297,207 A | 3/1994 | Degele | |
| 5,351,293 A | 9/1994 | Michener et al. | |
| 5,393,062 A | 2/1995 | Cember | |
| 5,414,771 A | 5/1995 | Fawcett, Jr. | |
| 5,561,713 A | 10/1996 | Suh | |
| 5,602,915 A | 2/1997 | Campana et al. | |
| 5,748,736 A | 5/1998 | Mittra | |
| 5,778,416 A | 7/1998 | Harrison et al. | |
| 5,832,228 A | 11/1998 | Holden et al. | |
| 5,960,086 A | 9/1999 | Atalla | |
| 6,041,408 A | 3/2000 | Nishioka et al. | |
| 6,088,449 A * | 7/2000 | Atalla | 380/273 |
| 6,148,404 A * | 11/2000 | Yatsukawa | 726/2 |
| 6,195,751 B1 | 2/2001 | Caronni et al. | |
| 6,275,859 B1 | 8/2001 | Wesley et al. | |
| 6,330,671 B1 | 12/2001 | Aziz | |
| 6,948,070 B1 * | 9/2005 | Ginter et al. | 713/193 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | | 032107 A1 | 7/1981 |
| EP | | 0447063 A2 | 9/1991 |
| EP | | 0602335 A2 | 6/1994 |
| GB | | 2223614 A | 4/1990 |
| NL | | A 9200876 | 12/1993 |
| WO | | WO95/09498 | 4/1995 |
| WO | | WO97/16902 | 5/1997 |

### OTHER PUBLICATIONS

Merkel, R.C., "Secure Communications Over Insecure Channels," Communications of the ACM, vol. 21, No. 4, Apr. 1978, pp. 294-299.

Radlo, E.J., "Cryptography in Cyberspace," New Matter, vol. 20, No. 3, Jul. 24, 1995, pp. 44-48.

Schneier, B., Applied Cryptography: protocols, algorithms, and source code in C, John Wiley & Sons, Inc., 1st Ed., 1994, pp. 42-65.

Tsubakiyama, H. and Kogo, K., "Security for Information Data Broadcasting System with Conditional-Access Control," IEEE, 1993, pp. 164-170.

Wadzinske, "Key Pointer Rekeying," Motorola Technical Developments, vol. 25, Jul. 1995, p. 136.

U.S. Appl. No. 09/095,350, filed Jun. 9, 1998, Martin M. Atalla, Donald Adams and James E. Bennett, Inventors, now abandoned, 27 pp.

* cited by examiner

Case3:11-cv-03797-JSW   Document1   Filed08/01/11   Page13 of 39



*FIG. 1*
(Prior Art)



*FIG. 2*
(Prior Art)



*FIG. 3A*



*FIG. 3B*



FIG. 4



*FIG. 5*

Case3:11-cv-03797-JSW   Document1   Filed08/01/11   Page17 of 39

| Datagram 601 | Seal 602 |

| Datagram 603 | Seal 604 |

| Datagram 605 | Seal 606 |

*FIG. 6*



*FIG. 7*

US 7,257,706 B1

1

# METHOD OF SECURING A DOCUMENT IN A SYSTEM AND CONTROLLING ACCESS TO THE DOCUMENT AND A SEAL FOR USE IN THE METHOD

## CROSS-REFERENCE TO RELATED APPLICATION

The present application is a continuation of U.S. patent application Ser. No. 09/370,384 filed Aug. 9, 1999 now U.S. Pat. No. 6,912,655 by Daniel F. Zucker entitled "Network Security Architecture System Utilizing Seals" which is incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

This invention relates to secure communications and in particular to systems and methods for multicast key management.

## BACKGROUND OF THE INVENTION

Broadcast or multicast is the transmission of data from a single sender to multiple recipients, with broadcast transmission being a "one-to-all" transmission and multicast transmission being a "one-to-many" transmission. In this application, "multicast" and "broadcast" will be used interchangeably.

FIG. 1 shows a typical multicast system 110 using conventional cryptography which is oriented toward point to point encryption. In a multicast system which uses point to point encryption, if party A wants to send data to parties B, C and D, party A must somehow communicate a secret key individually to each of the parties B, C and D such that no one else knows the key.

In the Public Key Infrastructure (PKI) cryptography, party A uses a common symmetric key K for all three transmissions, but sends this common symmetric key K three different times encrypted individually for each of the parties B, C and D. To do this encryption, party A makes use of first, second, and third keys, each different, for parties B, C and D, respectively. Each such key is called a "public key." The public key is part of the public/private key pair that has been previously established using conventional methods. For example, party A uses the public key for party B to encrypt a random common symmetric key K and then sends the encrypted common symmetric key 100 so encrypted to party B. Party A then uses the public keys for parties C and D to encrypt the random common symmetric key K to form encrypted common symmetric keys 102 and 104, respectively, and sends the encrypted common symmetric keys 102 and 104 to parties C and D, respectively. Party A then encrypts a message using the random common symmetric key K and broadcasts the encrypted message to all listeners. Parties B, C and D can now use their respective private keys to decrypt the encrypted common symmetric key K and then use the decrypted common symmetric key K to decrypt the broadcast message.

Alternatively, party A broadcasts the encrypted broadcast message 202 and the encrypted common symmetric keys 204 for each intended recipient, i.e., encrypted common symmetric keys 100, 102, and 104, to all listeners B, C and D, as shown in FIG. 2. A listener, for example, party B, then either tries to decrypt all the encrypted common symmetric keys using his private key, looking for the encrypted common symmetric key specifically encrypted for him, or, he looks for his name followed by an encrypted common

2

symmetric key if party A does not care about public knowledge of "who gets what message." Party B can then use the decrypted common symmetric key K to decrypt the broadcast message. An unintended recipient cannot find an encrypted common symmetric key that is encrypted for him, and thus is unable to decrypt the broadcast message.

The point to point encryption approach to multicast described above is sufficient if the recipients are few. However, the point to point encryption approach becomes difficult to manage as the number of the recipients increases. For example, if there are 10,000 recipients instead of three, party A would need to encrypt the single random symmetric key K 10,000 times using 10,000 public keys. As a result, key management, which involves the selection, distribution and maintenance of the encryption keys, and security becomes difficult and impractical.

Therefore, what is needed is an efficient multicast key management system.

## SUMMARY OF THE INVENTION

In accordance with the present invention, a method for efficient multicast key management is provided. The security server establishes a private access line ("PAL") which provides client I.D. and authentication between a client and the security server. The system allows the transmission of what are called "permits" and "seals" to allow the storage of secured documents and the accessing of secured documents by authorized clients or for secured messaging between clients.

As part of the security associated with the security server, the security server generates what is called a "seal." In one embodiment, the seal contains a key. In another embodiment, the seal contains the information to generate a key. The security server encodes this key or information to generate this key using any encryption method. The encoded key is called a "seal" which is generated by the security server. In one embodiment, the seal contains additional information, such as a user identification code, a policy which is a description as to who is allowed access to what (e.g., classification of files and security levels of clients), a message digest which is a hash of files (i.e., containing a "fingerprint" of a data stream), and a data/time stamp. The key or the information to generate the key is often called a "permit," so the permit is contained within the seal but may not be the exclusive contents of the seal. All the information contained in a seal is encrypted by the security server and can only be "opened," i.e., decrypted, by the security server which encrypted the seal.

In accordance with this invention, the security server generates seals and permits. These seals and permits are communicated between the security server and a security client. The security client may be, for example, an application server or an application client. The application server and application client pair can be a web server and web client pair, a lotus notes server and lotus notes client or a database server and database client pair. The application server first sends a request to the security server requesting a seal for a particular communication. The security server returns a seal to the application server which then broadcasts the seal to a plurality of application clients. Each client wishing to encrypt or decrypt a data stream sends the seal it received from the application server to the security server in an open seal request signal, together with the client's identification information, so that the seal can be "opened." The security server, upon receiving the open seal request signal, decrypts the seal and compares the client's identification

US 7,257,706 B1

3

with the policy stored at the security server. If the client's identification matches the policy, the security server extracts a permit from the decrypted seal and transmits the permit to the client in clear text form. In one embodiment, the client then uses the permit to generate an encryption/decryption key for encrypting a data stream or decrypting an encrypted data stream. If the client is a sender, he broadcasts the encrypted data stream together with the seal to all the listeners, regardless of the identity or the number of recipients because an unauthorized recipient will not be sent a permit from the security server.

In one embodiment, the same seal is sent periodically in an encrypted data stream. An offset value indicating an offset with respect to the beginning of an encrypted message is sent with each seal to enable the recipient to determine the portion of the data stream from where the decryption begins. This allows decryption of at least a portion of an encrypted data stream that is received partially.

In another embodiment of the invention, a copy of a seal that has been "opened" and its corresponding permit are cached and stored locally in the memory of the security client, the memory being denoted as a local seal cache. The next time a seal needs to be opened at the security client, the seal is first compared to all the seals stored in the local seal cache by, e.g., a byte-for-byte value comparison. If a match is found, a permit corresponding to the matched seal is returned from the local seal cache. Conversely, if there is no match, a request-to-open seal signal is sent to the security server to open the seal. If it has been established that the security client's identification matches the policy, the seal is opened. The newly opened seal and its corresponding permit are then stored in the local seal cache. When the local seal cache exceeds its capacity, the least recently used seal and permit pair is deleted from the local seal cache before the most recently opened seal and permit pair is stored.

In yet another embodiment of the invention, a seal is attached to every individual datagram packet in a UDP (User Datagram Protocol) system so that the order in which the packets are received does not have any significance because each packet is encrypted/decrypted individually. Similarly, a lost datagram packet does not affect the integrity of the encryption (although it might affect the integrity of the received data unless the data is resent.) In this embodiment, the server and the client do not need to negotiate a symmetric session key and an encryption algorithm upon each session initiation because every packet has its own seal and can be decrypted individually and independently from the other packets.

In another embodiment of the invention, a separate seal is appended to the head of any data stream, allowing full duplex communication. When the data with appended seal is received, the recipient sends the seal to the security server to be opened and uses the resulting permit received from the security server to decrypt the encrypted data. No synchronization or handshake protocol between the two duplex channels is required since the data sent in each direction has its own corresponding seal.

This invention will be more fully understood in light of the following detailed description taken together with the following drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 (prior art) shows a multicast system utilizing point to point cryptography;

FIG. 2 (prior art) shows an embodiment of a multicast system utilizing point to point cryptography;

4

FIG. 3A shows communication between a security server, an application server and a client;

FIG. 3B shows a multicast system in accordance with one embodiment of the present invention, wherein the same data stream is sent to all the recipients;

FIG. 4 shows an embodiment where the same seal is sent periodically in the data stream, each seal having a corresponding offset value;

FIG. 5 shows a flow chart illustrating a method for opening multiple instances of identical seals;

FIG. 6 illustrates key synchronization over an unreliable transport by appending a seal to each datagram packet; and

FIG. 7 illustrates key exchange and synchronization over a duplex channel by appending a seal to the head of each data stream.

The use of the same reference symbols in different drawings indicates similar or identical items.

DETAILED DESCRIPTION

The following description is meant to be illustrative only and not limiting. Other embodiments of this invention will be obvious in view of the following description to those skilled in the encryption arts.

FIGS. 3A and 3B illustrate a multicast system in accordance with the present invention. FIG. 3A shows a communication infrastructure using a security server 303 called TESS (TriStrata Enterprise Security Server) developed by TriStrata Security Inc. Security server 303 allows the transmission of what are called "seals" and "permits" to allow the storage of secured documents and the accessing of secured documents by authorized clients or for secured messaging between clients. The permit is essentially a key. The seal contains the encrypted permit and in some embodiments, additional client information. Seals and permits are described in detail below.

In one embodiment, secure communication between security server 303 and an application server 306 and communication between security server 303 and an application client 307 are accomplished by establishing a private access line (PAL) between security server 303 and application server 306 and a private access line between security server 303 and application client 307, respectively. Application server 306 is, for example, a web server, lotus notes server or database server. Application client 307 is, for example, a web client, a lotus notes client or a database client. It is noted that both application server 306 and application client 307 are security clients of security server 303.

In general, all secure communications between a client machine and a server machine (e.g., between an application server and an application client) are intercepted at the transmission control protocol/internet protocol sockets level and passed to the virtual private network machine for processing.

In one embodiment, the private access line is established by using a pointer exchange process described in U.S. Pat. No. 5,960,086 issued Sep. 28, 1999 (hereinafter the '086 patent) which is assigned to the same assignee as this application and is herein incorporated by reference in its entirety.

In the '086 patent, systems and methods are provided which allow a working key (i.e. the key used to encrypt a data stream) to be used only once and then changed in a manner which is essentially random, fast and unique to each client. In accordance with the invention disclosed in the '086 patent, a client accessing a network computer is issued a randomly selected bit stream of a given length. This bit

US 7,257,706 B1

5

6

stream, called the "master signature," is divided into bytes, and each byte is assigned a unique byte address. When this byte is addressed, the bits associated with this byte can be read out. In one embodiment of the '086 patent, a split signature, asymmetric mode technique is used to secure communications between a computer and client. From the computer's "master signature," a portion, called the "access signature," is selected and placed at the client. The computer, which could be at a bank or any service provider, retains the corresponding addresses filed under the client's I.D. This access signature includes both the bit information in the bytes selected from the master signature as well as the addresses of those bytes in the master signature. To securely communicate between a bank and a client, each selects a random set of addresses from the client's access signature. These independent sets of addresses are exchanged between sides. Each side, the bank and the client, now having both sets of addresses, obtains the corresponding bits which determine a unique session signature. Of importance, the particular bytes making up the session signature are never transmitted between the bank computer and the client. All that is transmitted are the addresses of the bytes making up the session signature. Both the client's terminal and the bank's computer have the identical session signature (also called the "session key").

One way to transmit the seals is discussed in U.S. Pat. No. 6,088,449 issued Jul. 11, 2000 (hereinafter the '449 patent) which is assigned to the same assignee as this application and is herein incorporated by reference in its entirety. The '449 patent discloses an improvement on the '086 patent wherein the session signature (i.e. key) is uniquely generated from a segment of the access signature by identifying the address of the initial byte in the session signature and the length of the session signature (i.e. the number of bytes or bits in the session signature) using a pointer. As a result, the number of bits required to transmit the addresses of bytes in the session signature is reduced substantially. The pointer defines both the address of the initial byte in the session signature and the number of bytes in the session signature. If desired, the session signature can be of a predefined length, or the session signature can be as long as the maximum length message, rendering unnecessary the bits in the pointer defining the length of the session signature.

In one embodiment of the '449 patent, a master signature is divided into two subsets of bytes and each subset is stored in a separate compartment. These two compartments, known as the "shared key buckets," are available to and shared with all clients authorized to use the bytes in the shared key buckets for encrypting information. Another two compartments of bytes called the "DES-keys buckets" reside securely only in the security server. The client accesses the security server and uses the pointer exchange process to establish a private access line which provides identification and authentication between the client and the security server. The security server issues to the client a permit which is a pair of pointers P1, P2 randomly selected from the two compartments of the shared key bucket. These pointers P1, P2 are transmitted to the client over the previously established PAL.

The client having received P1, P2 and having the shared key bucket thereby is able to determine the encryption key. The client then uses the encryption key so derived to encrypt the document to be stored in memory somewhere in the system. The server also derives two DES-keys from the DES-key bucket. These two DES-keys are determined by two separate pointers p1, p2, independent of pointers P1, P2 used to derive the session signature from the shared key

bucket. A derived DES-key is obtained by exclusively ORing the two DES-keys. The DES-key so derived is used to encrypt P1, P2 to provide a seal. The document, encrypted by the encryption key (i.e. the session signature) at the client, is then stored in memory in the system along with P1, P2 encrypted at the server by the DES-key to provide a seal, and the DES-key pointers p1 and p2.

The procedure which is followed for an authorized client to decrypt a document so secured is to:

1. pull the encrypted document, seal and p1, p2 from memory;

2. establish a PAL between the client and the security server;

3. transmit the seal and DES pointers from storage to the security server;

4. security server unlocks seal and transmits pointers P1, P2 to the client (the seal besides including P1, P2 can also include other data such as the time stamp and the client I.D.); and

5. client decrypts the document using pointers P1, P2.

Another U.S. patent application Ser. No. 09/095,350 (hereinafter the '350 application), filed Jun. 9, 1998, now abandoned, which is assigned to the same assignee as this application, discloses a further improvement for the security architecture system described above and is herein incorporated by reference in its entirety. The improved security architecture system utilizes pointers and employs a method for generating encryption bits from a set of bits in such a manner as to avoid redundancy and to obtain a large number of encryption bits from the given set of bits. In one embodiment, the pointer is made up of eight bits and the session signature to be identified by the address contained in the pointer is of a predefined length. Accordingly, no bits are required in the pointer to define the length (i.e. the number of bytes) in the session signature. All that is required is the address of the first byte in the session signature. Importantly, the string of bits defining the pointer includes one additional bit. Accordingly, additional pointers can be generated from this string of bits by shifting this string of bits one space and generating a new pointer from the shifted bit string. Repeating this shifting a number of times equal to the number of bits in the string yields an additional number of pointers equal to the number of bits in the string. When the original bit string is obtained, the string of bits is discarded to avoid defining a session signature already used. A second string of bits comprising a pointer plus one extra bit is then sent to the client from the central computer and used to again define additional session signatures.

In general, security server 303 generates a seal which contains encrypted information such as, but not limited to, permit, policy, message digest and date/time stamp. It is noted that the entire content of the seal is encrypted at security server 303 using any encryption method or standard, such as Data Encryption Standard (DES) and triple DES. The seal can only be "opened" by security server 303, and cannot be interpreted unless security server 303 opens it. The seal open process is discussed in detail later.

The permit is a set of bits containing information relating to an encryption/decryption key. For example, the permit may contain pointers that are used to generate the encryption/decryption keys, as discussed in the '086 and '449 patents and '350 application, incorporated by reference above. The permit may also contain the encryption/decryption key itself. The policy contains description as to who is allowed access to what, for example, the policy may contain classification of files or security levels for a client. The

US 7,257,706 B1

7

message digest is a hash of files, meaning that it contains a "fingerprint" of the data stream.

Referring to FIG. 3A, application server 306 first sends a seal request signal to security server 303 via a private access line 305, requesting a seal. Security server 303 sends a seal to application server 306 via private access line 318. Application server 306, after receiving the seal, sends the seal to application client 307 via communication line 313. Application client 307 receives the seal and sends a request-to-open-seal signal to security server 303 via private access line 312. Security server 303 verifies the status of application client 307 and sends a permit back to application client 307 via private access line 314. If the permit is an encryption/decryption key, the permit is used to encrypt/decrypt a message. If the permit contains information of an encryption/decryption key but not the key itself, application client 307 first generates an encryption/decryption key from the permit. Application client 307 then uses the generated encryption/decryption key to encrypt/decrypt a message.

In a multi-user system, the application server, e.g., party A, in one embodiment, broadcasts the seal to a plurality of application clients, e.g., parties B, C and D. When party A, e.g., application server 306, desires to encrypt a data stream, party A sends a request-for-seal signal 312, together with party A's identification to security server 303. Security server 303 compares the requested policy against party A's identification and policy to determine if party A is authorized to receive the seal. If security server 303 determines that party A is an authorized client, security server 303 returns a permit in clear text form with the requested seal via private access line 318 to party A. In one embodiment, as shown in FIG. 3B, for example, party A generates an encryption key (or session key) from the permit in a manner such as described in the above referenced patent applications. Party A then uses the encryption key to encrypt a data stream. Next, party A broadcasts the encrypted data stream 302 with an appended seal 304 to, e.g., parties B, C and D via communication lines 315, 316 and 317, respectively.

Parties B, C and D receive the same encrypted data stream and seal from party A. Each party B, C and D then individually sends the received seal 304 to the security server (not shown) to establish a PAL between each party B, C and D and the security server. As discussed above, only an authorized client receives a permit from the security server. For example, if party B is authorized, party B receives a permit from the security server. Party B can then use the permit to generate a decryption key that is the same as the encryption key generated by party A. Party B can then use the decryption key to decrypt the encrypted data stream. On the other hand, if party C is unauthorized, the security server does not return a permit to party C, and party C cannot generate the decryption key for decrypting the encrypted data stream. Similarly, parties B, C and D can generate encrypted data streams in the same manner as described for party A and broadcast the encrypted data streams to other parties.

By sending a seal instead of an asymmetric key pair, party A broadcasts the same encrypted data stream to all the recipients regardless of the identity or the number of the recipients. Unauthorized recipients are not allowed to open the seal at the security server, and without the appropriate permit, unauthorized recipients are unable to decrypt the encrypted data stream broadcast by party A.

The method described above solves the broadcast key distribution problem. However, the method works only if all the recipients receive the data stream from the beginning because the recipients who begin to receive the data in

8

midstream cannot decipher the data stream since the seal is sent only once at the beginning of the data stream. To solve the problem caused by recipients receiving data from midstream, in accordance with this invention, the same seal is sent periodically in the data stream.

FIG. 4 illustrates a method for efficient synchronization of keys for streaming media such that a recipient can begin decrypting the encrypted stream at selected points in the stream. Streaming media is typically employed for large multimedia files, where a client downloads a portion of a file, decompresses that portion and starts playing the contents, e.g., audio/video, before the rest of the file arrives. Subsequent portions of the multimedia file are downloaded while the previously downloaded portion is playing.

In accordance with this invention, data stream 400 is divided into data sections 401 through 404. Each data section 401 through 404 has a corresponding seal and a corresponding offset value indicating the offset with respect to the starting point of data stream 400, appended to the head of the data section. The offset values enable the recipients to determine where in data stream 400 the decryption begins so that at least a portion of data stream 400 can be decrypted. This is opposed to the method where the seal is only sent once at the beginning of the message, in which case if the beginning of the message is missing, the entire message cannot be decrypted. In an embodiment where the message is re-sent or sent more than once, sending seals periodically along with an offset value prevents the same portion of data stream 400 to be reused, i.e. decrypted more than once.

FIG. 5 is a flow chart illustrating an embodiment of the present invention, in which seals that have been opened previously are cached and stored in a local seal cache at the security client (e.g., application server and application client) so that multiple copies of the same seal do not have to be opened at the security server each and every time a seal is received by a security client. When the same seal is broadcast at various times, for example, when a seal is sent periodically in the data stream, as that described in conjunction with FIG. 4, a recipient may receive multiple copies of the same seal. One method is to open the seal at the security server each and every time a seal is received by a security client. However, opening the seal at the security server every time a seal is received uses an unnecessary number of transactions to the security server if the same seal is received by a security client multiple times. To operate the system more efficiently, the same seal can be used multiple times but only opened once, by caching the seals that were opened previously.

In step 500, the sender broadcasts a seal to a number of recipients. Each recipient compares the received seal with the seals that have been previously opened and stored in a local seal cache at the recipient (step 504). The local seal cache stores seals that have been opened and also their corresponding permits. In other words, the local seal cache contains seal/permit pairs. The local seal cache can be of any memory size, depending on the size of the seal/permit and the number of seal/permit pairs the user would like to store. The received seal is compared using, e.g., a byte-for-byte value comparison method. If the received seal matches one of the seals stored in the local seal cache (step 506), a corresponding permit is returned from the local seal cache to the recipient (step 508). However, if the received seal does not match any of the seals stored in the local cache, the seal is sent to the seal open routine at the security server (step 510). The security server decrypts the seal and compares the recipient's identity against the policy to determine whether the recipient is authorized (step 512). If the recipient is not

US 7,257,706 B1

9

properly authorized (step 512), the procedure returns to the beginning to await for another seal to be sent from a sender.

On the other hand, a permit is extracted from the seal if the recipient is properly authorized (step 514). A newly opened seal and its corresponding permit are stored in the local seal cache (step 520) if it has been determined that the seal cache is not full in step 516. If the seal cache is determined to be full (step 516), a least recently used seal and permit pair is deleted from the seal cache (step 518) before the newly opened seal and its corresponding permit are stored in the local seal cache (step 520). The permit is then returned from the seal cache to the recipient (step 508). By using a local seal cache, the system operates more efficiently because the same seal does not need to be opened multiple times by the security server.

FIG. 6 shows a seal appended to each data packet for a datagram communication. The majority of network security protocols gear toward connection-oriented protocols, e.g., transmission control protocol ("TCP"), because of the unreliable mechanism associated with internet protocol ("IP") for transferring data between two computers. TCP/IP provides a reliable stream of data that is in the exact sequence generated by the source. TCP/IP accomplishes this by breaking the data stream into packets small enough to fit inside IP datagrams which are numbered and sent using an acknowledgment-with-retransmission paradigm, meaning that the receiver sends an explicit or implicit acknowledgment for each IP datagram. The sender waits for some time and then retransmits the IP datagram if it does not receive an acknowledgment. In this scheme, the source port and the destination port must be identified prior to transmission of a data stream.

The minority few cater to datagram communication such as User Datagram Protocol (UDP). UDP is a connectionless datagram protocol and has certain advantages over a connection-oriented protocol such as TCP/IP. For example, in a datagram communication, every packet of data is sent individually from the source to the destination. No connection, e.g., handshaking mechanism, is required for sending a datagram packet. However, the UDP protocol is unreliable because there is no guarantee that a sent packet will arrive at its destination. There is also no guarantee that packets will be received in the same order they are sent. Therefore, UDP encryption either relies on long term host-pair keying or imposes a session-oriented protocol. In addition, setup is needed to establish a shared key.

The present invention provides a simple technique to secure datagram communication without the extra setup in establishing a secure session, wherein a seal is appended onto each individual datagram packet, as shown in FIG. 6. For example, seal 602 is appended onto datagram packet 601; seal 604 is appended onto datagram packet 603; and seal 606 is appended onto datagram packet 605. By allowing each datagram packet 601, 603, 605 to have its own seal 602, 604, 606, respectively, the order in which the datagram packets are received becomes irrelevant because no handshake or synchronization between the sender and the receiver is required. Similarly, a lost datagram packet does not impact the communication or the encryption integrity for the rest of the packets because every packet has its own seal and encryption/decryption for each packet can be accomplished individually and independently from the other packets. Hence, a seal appended to each datagram packet effectively eliminates the need for a connection setup, e.g., synchronizing encryption/decryption keys.

FIG. 7 illustrates a duplex transmission utilizing seals. In conventional cryptography, the exchange of keys between

10

two communicating entities involves some form of handshake mechanism in which a shared symmetric key is exchanged. The handshake mechanism creates extra overhead which in turn incurs significant time penalties for time critical applications such as teleconferencing. FIG. 7 illustrates a data stream 700 where a seal 704 is appended to the head of data section 702, sent from a first party. Another data stream 700 having a seal 710 appended to the head of data section 708 is sent from a second party. The appending of the seal to the head of a data section allows full duplex communication without the initial exchange of keys, thus avoiding associated costs.

When data section 702 with the appended seal 704 is received at the second party, the second party sends the seal to the security server to be opened. The security server then returns a permit if the second party is an authorized client. The second party can then generate a decryption key from the permit and decrypt the received data 702. Similarly, when data section 708 with the appended seal 710 is received at the first party, the first party sends seal 710 to the security server to be opened. The security server returns a permit extracted from seal 710 if the first party is authorized. The first party then uses the returned permit to generate a decryption key which is then used to decrypt the received data section 708. No synchronization between the first party and the second party is required because the data from each party has its own seal. Furthermore, no handshake protocol is required since no key exchange is required between the first party and the second party.

Although the invention has been described with reference to particular embodiments, the description is illustrative and not limiting. Various other adaptations and combinations of features of the embodiments disclosed are within the scope of the invention as defined by the following claims.

What is claimed is:

1. A method of securing a document stored in a computer system which is part of a network, comprising:

creating a seal associated with a document which is to be stored or shared within the computer system or network:

placing in the seal information identifying the person requesting that the document be secured (hereinafter the "requestor"); and

placing in the seal information identifying who can access the document;

thereby allowing one or more designated persons to have access to the document in accordance with the information in the seal.

2. The method as in claim 1 wherein said seal includes a unique key.

3. The method of claim 2 further comprising sending said key to the requestor so that the key can be used by the requestor to encrypt the document.

4. A method of securing a document stored in a computer system which is part of a network, which comprises:

creating a seal associated with a document which is to be stored or shared within the computer system or network, the seal further comprising information:

a). identifying the person requesting that the document be secured (hereinafter the "requestor"); and

b). identifying who can access the document;

sending a key to the requestor so that the key can be used by the requestor to encrypt the document; and

the requestor discarding the key following the encryption of the document:

US 7,257,706 B1

11

12

thereby to allow one or more designated persons to have access to the document in accordance with the information in the seal.

5. The method of claim 1 further comprising adding policy to the seal in the form of control information.

6. A method for sealing and controlling access to a document stored or communicated in a computer system which is part of a network which comprises:

creating a seal as part of a document which remains a part of the document when the document is in storage or when the document is sent in communication or is shared anywhere within the computer system or network;

placing in the seal information identifying the person requesting that the document be secured (hereinafter the "requestor"); and

placing in the seal information identifying who can access the document;

said seal allowing the system to validate the requestor, and identify those authorized by the requestor to have access to the document.

7. The method of claim 6 further comprising including in said seal information which allows the computer system to identify the name of the document.

8. A method for sealing and controlling access to a document stored or communicated in a computer system which is part of a network which comprises:

creating a seal as part of a document which remains a part of the document when the document is in storage or when the document is sent in communication or is shared anywhere within the computer system or network; and

including in said seal hash information from the document which allows the computer system to check the integrity of the document:

said seal allowing the system to validate the requestor, and identify those authorized by the requestor to have access to the document.

9. The method of claim 6 further comprising including in said seal information which allows the computer system to identify who, whether an individual, hierarchy or group, can access the document.

10. The method of claim 6 further comprising including in said seal information which allows the computer system to identify time or other constraints for access to the document.

11. A method for sealing and controlling access to a document stored or communicated in a computer system which is part of a network which comprises:

creating a seal as part of a document which remains a part of the document when the document is in storage or when the document is sent in communication or is shared anywhere within the computer system or network; and

including in said seal information which allows a server to add a unique key to the seal:

said seal allowing the system to validate the requestor, and identify those authorized by the requestor to have access to the document.

12. The method of claim 6 further comprising including in said seal information which allows the computer system to timestamp the document.

13. The method of claim 6 further comprising including in said seal information which allows the computer system to confirm server identity.

14. A method for sealing and controlling access to a document stored or communicated in a computer system which is part of a network which comprises:

creating a seal as part of a document which remains a part of the document when the document is in storage or when the document is sent in communication or is shared anywhere within the computer system or network; and

encrypting said seal using a unique key at a server:

said seal allowing the system to validate the requestor, and identify those authorized by the requestor to have access to the document.

15. The method of claim 6 further comprising including in said seal the ability to allow the system to deliver the seal and a key using a PAL ("private access line") to the requestor so that the requestor can encrypt a document and attach the seal to the encrypted document.

16. A seal for securing a document stored in a computer system which is part of a network, said seal being associated with a document which is to be stored or shared within the computer system or network, said seal comprising:

a) information identifying the person requesting that the document be secured (hereinafter the "requestor"); and

b) information identifying who can access the document; whereby the seal allows one or more designated persons to have access to the document in accordance with the information in the seal.

17. The seal as in claim 16 wherein said seal includes a unique key.

18. The seal of claim 17 wherein said key can be used by the requestor to encrypt the document.

19. The seal of claim 16 further comprising information relating to policy in the form of control information.

20. A seal for sealing and controlling access to a document stored or communicated in a system which is part of a network, said seal comprising selected information, said selected information comprising:

information identifying the person requesting that the document be secured (hereinafter the "requestor"); and

information identifying who can access the document;

said seal being a part of the document and remaining a part of the document when the document is in storage or when the document is sent in communication or is shared anywhere within the system or network, said seal allowing the system to validate the requestor, and identify those authorized by the requestor to have access to the document.

21. The seal of claim 20 further comprising information which allows the system to identify the name of the document.

22. The seal of claim 20 further comprising hash information from the document which allows the system to check the integrity of the document.

23. The seal of claim 20 further comprising information which allows the system to identify who, whether an individual, hierarchy or group, can access the document.

24. The seal of claim 20 further comprising information which allows the system to identify time or other constraints for access to the document.

25. A seal for sealing and controlling access to a document stored or communicated in a system which is part of a network, said seal comprising selected information, said selected information comprising:

information identifying the person requesting that the document be secured (hereinafter the "requestor");

information identifying who can access the document; and

information which allows a server to add a unique document key to the seal;

US 7,257,706 B1

13

said seal being a part of the document and remaining a part of the document when the document is in storage or when the document is sent in communication or is shared anywhere within the system or network, said seal allowing the system to validate the requestor, and identify those authorized by the requestor to have access to the document.

26. The seal of claim **20** further comprising information which allows the system to time stamp the document.

27. The seal of claim **20** further comprising information which allows the system to confirm server identity.

28. A seal for sealing and controlling access to a document stored or communicated in a system which is part of a network, said seal comprising selected information, said selected information comprising:

information identifying the person requesting that the document be secured (hereinafter the "requestor"); and

14

information identifying who can access the document; wherein said seal is encrypted using a unique key at a server;

said seal being a part of the document and remaining a part of the document when the document is in storage or when the document is sent in communication or is shared anywhere within the system or network, said seal allowing the system to validate the requestor, and identify those authorized by the requestor to have access to the document.

29. The seal of claim **20** wherein said seal is such as to allow the system to deliver the seal and a key using a PAL ("private access line") to the requestor of a document so that the requestor can encrypt the document and attach the seal to the encrypted document.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# **CERTIFICATE OF CORRECTION**

PATENT NO. : 7,257,706 B1      Page 1 of 1
APPLICATION NO. : 11/123751
DATED    : August 14, 2007
INVENTOR(S) : Daniel F. Zucker, Martin M. Atalla and Donald S. Adams

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page
Page 1, change "Inventor: Daniel F. Zucker, Palo Alto, CA (US)", to --Inventors: Daniel F. Zucker, Palo Alto, CA (US); Martin M. Atalla, Atherton, CA (US); Donald S. Adams, Pleasanton, CA (US)--

Signed and Sealed this

Thirtieth Day of October, 2007

*Jon W. Dudas*

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

**EXHIBIT  B**

US007743249B1

(12) **United States Patent**
Zucker et al.

(10) Patent No.: **US 7,743,249 B1**
(45) Date of Patent: **\*Jun. 22, 2010**

(54) **METHOD OF SECURING A DOCUMENT IN A SYSTEM AND CONTROLLING ACCESS TO THE DOCUMENT AND A SEAL FOR USE IN THE METHOD**

(75) Inventors: **Daniel F. Zucker**, Palo Alto, CA (US); **Martin M. Atalla**, Atherton, CA (US); **Donald S. Adams**, Pleasanton, CA (US)

(73) Assignee: **TriStrata Security, Inc.**, Atherton, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 609 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/706,571**

(22) Filed: **Feb. 14, 2007**
(Under 37 CFR 1.47)

**Related U.S. Application Data**

(63) Continuation of application No. 11/123,751, filed on May 6, 2005, now Pat. No. 7,257,706, which is a continuation of application No. 09/370,384, filed on Aug. 9, 1999, now Pat. No. 6,912,655.

(51) **Int. Cl.**
*H04L 9/08* (2006.01)
*H04K 1/00* (2006.01)

(52) **U.S. Cl.** ...................................... **713/163**; 713/181

(58) **Field of Classification Search** .................. 713/181
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,607,137 A    8/1986   Jansen

(Continued)

FOREIGN PATENT DOCUMENTS

DE    4243908 A1    6/1994

(Continued)

OTHER PUBLICATIONS

Gifford, David K., "Cryptographic Sealing for Information Secrecy and Authentication", Apr. 1982, Communications of the ACM, pp. 274-286.*

(Continued)

*Primary Examiner*—Matthew B Smithers
(74) *Attorney, Agent, or Firm*—Haynes and Boone, LLP

(57) **ABSTRACT**

An efficient multicast key management is achieved by using seals. A security server generates a seal. In one embodiment, the seal contains a key. In another embodiment, the seal contains information for generating a key. An application server requests the seal from the security server and broadcasts the seal to a plurality of recipients. A recipient wishing to encrypt or decrypt a data stream transmits the received seal to the security server to be opened. If the recipient is authorized, the security server transmits a permit to the authorized recipient. In one embodiment, the recipient generates a key from the permit. In another embodiment, the permit is the key. If the recipient is a sender, the recipient encrypts data using the key and broadcasts the same encrypted data stream to all receivers. If the recipient is a receiver, the recipient decrypts an encrypted data stream using the key. In one embodiment, a seal with a corresponding offset value is sent periodically in a data stream. In another embodiment, multiple instances of identical seals are opened only once. In yet another embodiment, a seal is appended to each datagram packet. In a further embodiment, a seal is appended to any data stream.

13 Claims, 5 Drawing Sheets



**US 7,743,249 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,679,236 | A | 7/1987 | Davies |
| 4,853,962 | A | 8/1989 | Brockman |
| 4,878,246 | A | 10/1989 | Pastor et al. |
| 4,972,472 | A | 11/1990 | Brown et al. |
| 4,991,087 | A | 2/1991 | Burkowski et al. |
| 5,081,677 | A | 1/1992 | Green et al. |
| 5,115,467 | A | 5/1992 | Esserman et al. |
| 5,120,939 | A | 6/1992 | Claus et al. |
| 5,199,073 | A | 3/1993 | Scott |
| 5,245,658 | A | 9/1993 | Bush et al. |
| 5,297,207 | A | 3/1994 | Degele |
| 5,351,293 | A | 9/1994 | Michener et al. |
| 5,393,062 | A | 2/1995 | Cember |
| 5,414,771 | A | 5/1995 | Fawcett, Jr. |
| 5,561,713 | A | 10/1996 | Suh |
| 5,602,915 | A | 2/1997 | Campana et al. |
| 5,748,736 | A | 5/1998 | Mittra |
| 5,778,416 | A | 7/1998 | Harrison et al. |
| 5,832,228 | A | 11/1998 | Holden et al. |
| 5,960,086 | A | 9/1999 | Atalla |
| 6,041,408 | A | 3/2000 | Nishioka et al. |
| 6,088,449 | A | * 7/2000 | Atalla ..................... 380/273 |
| 6,148,404 | A | 11/2000 | Yatsukawa |
| 6,195,751 | B1 | 2/2001 | Caronni et al. |
| 6,275,859 | B1 | 8/2001 | Wesley et al. |
| 6,330,671 | B1 | 12/2001 | Aziz |

| | | | |
|---|---|---|---|
| 6,948,070 | B1 | 9/2005 | Ginter et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 032107 A1 | 7/1981 |
| EP | 0447063 A2 | 9/1991 |
| EP | 0602335 A2 | 6/1994 |
| GB | 2223614 A | 4/1990 |
| NL | A 9200876 | 12/1993 |
| WO | WO 95/09498 | 4/1995 |
| WO | WO 97/16902 | 5/1997 |

## OTHER PUBLICATIONS

McGovern, T., "Varying Encryption Keys for a Single Call," Motorola Technical Developments, vol. 24, Mar. 1995, pp. 61-62.

Merkel, R.C., "Secure Communications Over Insecure Channels," Communications of the ACM, vol. 21, No. 4, Apr. 1978, pp. 294-299.

Radlo, E.J., "Cryptography in Cyberspace," New Matter, vol. 20, No. 3, Jul. 24, 1995, pp. 44-48.

Schneier, B. Applied Cryptography: protocols, algorithms, and source code in C, John Wiley & Sons, Inc., 1st Ed., 1994, pp. 42-65.

Tsubakiyama, H. and Kogo, K., "Security for Information Data Broadcasting System with Conditional-Access Control," IEEE, 1993, pp. 164-170.

Wadzinske, "Key Pointer Rekeying," Motorola Technical Developments, vol. 25, Jul. 1995, p. 136.

* cited by examiner



**FIG. 1**
(Prior Art)



**FIG. 2**
(Prior Art)



*FIG. 3A*



*FIG. 3B*



*FIG. 4*



*FIG. 5*

| Datagram 601 | Seal 602 | | Datagram 603 | Seal 604 | | Datagram 605 | Seal 606 |
|---|---|---|---|---|---|---|---|

*FIG. 6*



*FIG. 7*

US 7,743,249 B1

1

# METHOD OF SECURING A DOCUMENT IN A SYSTEM AND CONTROLLING ACCESS TO THE DOCUMENT AND A SEAL FOR USE IN THE METHOD

## CROSS-REFERENCE TO RELATED APPLICATION

The present application is a continuation of U.S. patent application Ser. No. 11/123,751 filed May 6, 2005 by Daniel F. Zucker entitled "Method of Securing a Document in a System and Controlling Access to the Document and a Seal for Use in the Method", which is a continuation of U.S. patent application Ser. No. 09/370,384 filed Aug. 9, 1999 by Daniel F. Zucker entitled "Network Security Architecture System Utilizing Seals" which is incorporated herein by reference in its entirety.

## FIELD OF THE INVENTION

This invention relates to secure communications and in particular to systems and methods for multicast key management.

## BACKGROUND OF THE INVENTION

Broadcast or multicast is the transmission of data from a single sender to multiple recipients, with broadcast transmission being a "one-to-all" transmission and multicast transmission being a "one-to-many" transmission. In this application, "multicast" and "broadcast" will be used interchangeably.

FIG. 1 shows a typical multicast system 110 using conventional cryptography which is oriented toward point to point encryption. In a multicast system which uses point to point encryption, if party A wants to send data to parties B, C and D, party A must somehow communicate a secret key individually to each of the parties B, C and D such that no one else knows the key.

In the Public Key Infrastructure (PKI) cryptography, party A uses a common symmetric key K for all three transmissions, but sends this common symmetric key K three different times encrypted individually for each of the parties B, C and D. To do this encryption, party A makes use of first, second, and third keys, each different, for parties B, C and D, respectively. Each such key is called a "public key." The public key is part of the public/private key pair that has been previously established using conventional methods. For example, party A uses the public key for party B to encrypt a random common symmetric key K and then sends the encrypted common symmetric key 100 so encrypted to party B. Party A then uses the public keys for parties C and D to encrypt the random common symmetric key K to form encrypted common symmetric keys 102 and 104, respectively, and sends the encrypted common symmetric keys 102 and 104 to parties C and D, respectively. Party A then encrypts a message using the random common symmetric key K and broadcasts the encrypted message to all listeners. Parties B, C and D can now use their respective private keys to decrypt the encrypted common symmetric key K and then use the decrypted common symmetric key K to decrypt the broadcast message.

Alternatively, party A broadcasts the encrypted broadcast message 202 and the encrypted common symmetric keys 204 for each intended recipient, i.e., encrypted common symmetric keys 100, 102, and 104, to all listeners B, C and D, as shown in FIG. 2. A listener, for example, party B, then either tries to decrypt all the encrypted common symmetric keys

2

using his private key, looking for the encrypted common symmetric key specifically encrypted for him, or, he looks for his name followed by an encrypted common symmetric key if party A does not care about public knowledge of "who gets what message." Party B can then use the decrypted common symmetric key K to decrypt the broadcast message. An unintended recipient cannot find an encrypted common symmetric key that is encrypted for him, and thus is unable to decrypt the broadcast message.

The point to point encryption approach to multicast described above is sufficient if the recipients are few. However, the point to point encryption approach becomes difficult to manage as the number of the recipients increases. For example, if there are 10,000 recipients instead of three, party A would need to encrypt the single random symmetric key K 10,000 times using 10,000 public keys. As a result, key management, which involves the selection, distribution and maintenance of the encryption keys, and security becomes difficult and impractical.

Therefore, what is needed is an efficient multicast key management system.

## SUMMARY OF THE INVENTION

In accordance with the present invention, a method for efficient multicast key management is provided. The security server establishes a private access line ("PAL") which provides client I.D. and authentication between a client and the security server. The system allows the transmission of what are called "permits" and "seals" to allow the storage of secured documents and the accessing of secured documents by authorized clients or for secured messaging between clients.

As part of the security associated with the security server, the security server generates what is called a "seal." In one embodiment, the seal contains a key. In another embodiment, the seal contains the information to generate a key. The security server encodes this key or information to generate this key using any encryption method. The encoded key is called a "seal" which is generated by the security server. In one embodiment, the seal contains additional information, such as a user identification code, a policy which is a description as to who is allowed access to what (e.g., classification of files and security levels of clients), a message digest which is a hash of files (i.e., containing a "fingerprint" of a data stream), and a date/time stamp. The key or the information to generate the key is often called a "permit," so the permit is contained within the seal but may not be the exclusive contents of the seal. All the information contained in a seal is encrypted by the security server and can only be "opened," i.e., decrypted, by the security server which encrypted the seal.

In accordance with this invention, the security server generates seals and permits. These seals and permits are communicated between the security server and a security client. The security client may be, for example, an application server or an application client. The application server and application client pair can be a web server and web client pair, a lotus notes server and lotus notes client pair or a database server and database client pair. The application server first sends a request to the security server requesting a seal for a particular communication. The security server returns a seal to the application server which then broadcasts the seal to a plurality of application clients. Each client wishing to encrypt or decrypt a data stream sends the seal it received from the application server to the security server in an open seal request signal, together with the client's identification information, so that the seal can be "opened." The security server,

US 7,743,249 B1

3

upon receiving the open seal request signal, decrypts the seal and compares the client's identification with the policy stored at the security server. If the client's identification matches the policy, the security server extracts a permit from the decrypted seal and transmits the permit to the client in clear text form. In one embodiment, the client then uses the permit to generate an encryption/decryption key for encrypting a data stream or decrypting an encrypted data stream. If the client is a sender, he broadcasts the encrypted data stream together with the seal to all the listeners, regardless of the identity or the number of recipients because an unauthorized recipient will not be sent a permit from the security server.

In one embodiment, the same seal is sent periodically in an encrypted data stream. An offset value indicating an offset with respect to the beginning of an encrypted message is sent with each seal to enable the recipient to determine the portion of the data stream from where the decryption begins. This allows decryption of at least a portion of an encrypted data stream that is received partially.

In another embodiment of the invention, a copy of a seal that has been "opened" and its corresponding permit are cached and stored locally in the memory of the security client, the memory being denoted as a local seal cache. The next time a seal needs to be opened at the security client, the seal is first compared to all the seals stored in the local seal cache by, e.g., a byte-for-byte value comparison. If a match is found, a permit corresponding to the matched seal is returned from the local seal cache. Conversely, if there is no match, a request-to-open seal signal is sent to the security server to open the seal. If it has been established that the security client's identification matches the policy, the seal is opened. The newly opened seal and its corresponding permit are then stored in the local seal cache. When the local seal cache exceeds its capacity, the least recently used seal and permit pair is deleted from the local seal cache before the most recently opened seal and permit pair is stored.

In yet another embodiment of the invention, a seal is attached to every individual datagram packet in a UDP (User Datagram Protocol) system so that the order in which the packets are received does not have any significance because each packet is encrypted/decrypted individually. Similarly, a lost datagram packet does not affect the integrity of the encryption (although it might affect the integrity of the received data unless the data is resent.) In this embodiment, the server and the client do not need to negotiate a symmetric session key and an encryption algorithm upon each session initiation because every packet has its own seal and can be decrypted individually and independently from the other packets.

In another embodiment of the invention, a separate seal is appended to the head of any data stream, allowing full duplex communication. When the data with appended seal is received, the recipient sends the seal to the security server to be opened and uses the resulting permit received from the security server to decrypt the encrypted data. No synchronization or handshake protocol between the two duplex channels is required since the data sent in each direction has its own corresponding seal.

This invention will be more fully understood in light of the following detailed description taken together with the following drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 (prior art) shows a multicast system utilizing point to point cryptography;

4

FIG. 2 (prior art) shows an embodiment of a multicast system utilizing point to point cryptography;

FIG. 3A shows communication between a security server, an application server and a client;

FIG. 3B shows a multicast system in accordance with one embodiment of the present invention, wherein the same data stream is sent to all the recipients;

FIG. 4 shows an embodiment where the same seal is sent periodically in the data stream, each seal having a corresponding offset value;

FIG. 5 shows a flow chart illustrating a method for opening multiple instances of identical seals;

FIG. 6 illustrates key synchronization over an unreliable transport by appending a seal to each datagram packet; and

FIG. 7 illustrates key exchange and synchronization over a duplex channel by appending a seal to the head of each data stream.

The use of the same reference symbols in different drawings indicates similar or identical items.

DETAILED DESCRIPTION

The following description is meant to be illustrative only and not limiting. Other embodiments of this invention will be obvious in view of the following description to those skilled in the encryption arts.

FIGS. 3A and 3B illustrate a multicast system in accordance with the present invention. FIG. 3A shows a communication infrastructure using a security server 303 called TESS (TriStrata Enterprise Security Server) developed by TriStrata Security Inc. Security server 303 allows the transmission of what are called "seals" and "permits" to allow the storage of secured documents and the accessing of secured documents by authorized clients or for secured messaging between clients. The permit is essentially a key. The seal contains the encrypted permit and in some embodiments, additional client information. Seals and permits are described in detail below.

In one embodiment, secure communication between security server 303 and an application server 306 and communication between security server 303 and an application client 307 are accomplished by establishing a private access line (PAL) between security server 303 and application server 306 and a private access line between security server 303 and application client 307, respectively. Application server 306 is, for example, a web server, lotus notes server or database server. Application client 307 is, for example, a web client, a lotus notes client or a database client. It is noted that both application server 306 and application client 307 are security clients of security server 303.

In general, all secure communications between a client machine and a server machine (e.g., between an application server and an application client) are intercepted at the transmission control protocol/internet protocol sockets level and passed to the virtual private network machine for processing.

In one embodiment, the private access line is established by using a pointer exchange process described in U.S. Pat. No. 5,960,086 issued Sep. 28, 1999 (hereinafter the '086 Patent) which is assigned to the same assignee as this application and is herein incorporated by reference in its entirety.

In the '086 Patent, systems and methods are provided which allow a working key (i.e. the key used to encrypt a data stream) to be used only once and then changed in a manner which is essentially random, fast and unique to each client. In accordance with the invention disclosed in the '086 Patent, a client accessing a network computer is issued a randomly selected bit stream of a given length. This bit stream, called

US 7,743,249 B1

| 5 | 6 |

the "master signature," is divided into bytes, and each byte is assigned a unique byte address. When this byte is addressed, the bits associated with this byte can be read out. In one embodiment of the '086 Patent, a split signature, asymmetric mode technique is used to secure communications between a computer and client. From the computer's "master signature," a portion, called the "access signature," is selected and placed at the client. The computer, which could be at a bank or any service provider, retains the corresponding addresses filed under the client's I.D. This access signature includes both the bit information in the bytes selected from the master signature as well as the addresses of those bytes in the master signature. To securely communicate between a bank and a client, each selects a random set of addresses from the client's access signature. These independent sets of addresses are exchanged between sides. Each side, the bank and the client, now having both sets of addresses, obtains the corresponding bits which determine a unique session signature. Of importance, the particular bytes making up the session signature are never transmitted between the bank computer and the client. All that is transmitted are the addresses of the bytes making up the session signature. Both the client's terminal and the bank's computer have the identical session signature (also called the "session key").

One way to transmit the seals is discussed in U.S. Pat. No. 6,088,449 issued Jul. 11, 2000 (hereinafter the '449 Patent) which is assigned to the same assignee as this application and is herein incorporated by reference in its entirety. The '449 Patent discloses an improvement on the '086 Patent wherein the session signature (i.e. key) is uniquely generated from a segment of the access signature by identifying the address of the initial byte in the session signature and the length of the session signature (i.e. the number of bytes or bits in the session signature) using a pointer. As a result, the number of bits required to transmit the addresses of bytes in the session signature is reduced substantially. The pointer defines both the address of the initial byte in the session signature and the number of bytes in the session signature. If desired, the session signature can be of a predefined length, or the session signature can be as long as the maximum length message, rendering unnecessary the bits in the pointer defining the length of the session signature.

In one embodiment of the '449 Patent, a master signature is divided into two subsets of bytes and each subset is stored in a separate compartment. These two compartments, known as the "shared key buckets," are available to and shared with all clients authorized to use the bytes in the shared key buckets for encrypting information. Another two compartments of bytes called the "DES-keys buckets" reside securely only in the security server. The client accesses the security server and uses the pointer exchange process to establish a private access line which provides identification and authentication between the client and the security server. The security server issues to the client a permit which is a pair of pointers P1, P2 randomly selected from the two compartments of the shared key bucket. These pointers P1, P2 are transmitted to the client over the previously established PAL.

The client having received P1, P2 and having the shared key bucket thereby is able to determine the encryption key. The client then uses the encryption key so derived to encrypt the document to be stored in memory somewhere in the system. The server also derives two DES-keys from the DES-key bucket. These two DES-keys are determined by two separate pointers p1, p2, independent of pointers P1, P2 used to derive the session signature from the shared key bucket. A derived DES-key is obtained by exclusively ORing the two DES-keys. The DES-key so derived is used to encrypt P1, P2

to provide a seal. The document, encrypted by the encryption key (i.e. the session signature) at the client, is then stored in memory in the system along with P1, P2 encrypted at the server by the DES-key to provide a seal, and the DES-key pointers p1 and p2.

The procedure which is followed for an authorized client to decrypt a document so secured is to:

1. pull the encrypted document, seal and p1, p2 from memory;

2. establish a PAL between the client and the security server;

3. transmit the seal and DES pointers from storage to the security server;

4. security server unlocks seal and transmits pointers P1, P2 to the client (the seal besides including P1, P2 can also include other data such as the time stamp and the client I.D.); and

5. client decrypts the document using pointers P1, P2.

Another U.S. patent application Ser. No. 09/095,350 (hereinafter the '350 application), filed Jun. 9, 1998, now abandoned, which is assigned to the same assignee as this application, discloses a further improvement for the security architecture system described above and is herein incorporated by reference in its entirety. The improved security architecture system utilizes pointers and employs a method for generating encryption bits from a set of bits in such a manner as to avoid redundancy and to obtain a large number of encryption bits from the given set of bits. In one embodiment, the pointer is made up of eight bits and the session signature to be identified by the address contained in the pointer is of a predefined length. Accordingly, no bits are required in the pointer to define the length (i.e. the number of bytes) in the session signature. All that is required is the address of the first byte in the session signature. Importantly, the string of bits defining the pointer includes one additional bit. Accordingly, additional pointers can be generated from this string of bits by shifting this string of bits one space and generating a new pointer from the shifted bit string. Repeating this shifting a number of times equal to the number of bits in the string yields an additional number of pointers equal to the number of bits in the string. When the original bit string is obtained, the string of bits is discarded to avoid defining a session signature already used. A second string of bits comprising a pointer plus one extra bit is then sent to the client from the central computer and used to again define additional session signatures.

In general, security server 303 generates a seal which contains encrypted information such as, but not limited to, permit, policy, message digest and date/time stamp. It is noted that the entire content of the seal is encrypted at security server 303 using an encryption method or standard, such as Data Encryption Standard (DES) and triple DES. The seal can only be "opened" by security server 303, and cannot be interpreted unless security server 303 opens it. The seal open process is discussed in detail later.

The permit is a set of bits containing information relating to an encryption/decryption key. For example, the permit may contain pointers that are used to generate the encryption/ decryption keys, as disclosed in the '086 and '449 Patents and '350 application, incorporated by reference above. The permit may also contain the encryption/decryption key itself. The policy contains description as to who is allowed access to what, for example, the policy may contain classification of files or security levels for a client. The message digest is a hash of files, meaning that it contains a "fingerprint" of a data stream.

Referring to FIG. 3A, application server 306 first sends a seal request signal to security server 303 via a private access

US 7,743,249 B1

7

line 305, requesting a seal. Security server 303 sends a seal to application server 306 via private access line 318. Application server 306, after receiving the seal, sends the seal to application client 307 via communication line 313. Application client 307 receives the seal and sends a request-to-open-seal signal to security server 303 via private access line 312. Security server 303 verifies the status of application client 307 and sends a permit back to application client 307 via private access line 314. If the permit is an encryption/decryption key, the permit is used to encrypt/decrypt a message. If the permit contains information of an encryption/decryption key but not the key itself, application client 307 first generates an encryption/decryption key from the permit. Application client 307 then uses the generated encryption/decryption key to encrypt/decrypt a message.

In a multi-user system, the application server, e.g., party A, in one embodiment, broadcasts the seal to a plurality of application clients, e.g., parties B, C and D. When party A, e.g., application server 306, desires to encrypt a data stream, party A sends a request-for-seal signal 312, together with party A's identification to security server 303. Security server 303 compares the requested policy against party A's identification and policy to determine if party A is authorized to receive the seal. If security server 303 determines that party A is an authorized client, security server 303 returns a permit in clear form with the requested seal via private access line 318 to party A. In one embodiment, as shown in FIG. 3B, for example, party A generates an encryption key (or session key) from the permit in a manner such as described in the above referenced patent applications. Party A then uses the encryption key to encrypt a data stream. Next, party A broadcasts the encrypted data stream 302 with an appended seal 304 to, e.g., parties B, C and D via communication lines 315, 316 and 317, respectively.

Parties B, C and D receive the same encrypted data stream and seal from party A. Each party B, C and D then individually sends the received seal 304 to the security server (not shown) to establish a PAL between each party B, C and D and the security server. As discussed above, only an authorized client receives a permit from the security server. For example, if party B is authorized, party B receives a permit from the security server. Party B can then use the permit to generate a decryption key that is the same as the encryption key generated by party A. Party B can then use the decryption key to decrypt the encrypted data stream. On the other hand, if party C is unauthorized, the security server does not return a permit to party C, and party C cannot generate the decryption key for decrypting the encrypted data stream. Similarly, parties B, C and D can generate encrypted data streams in the same manner as described for party A and broadcast the encrypted data streams to other parties.

By sending a seal instead of an asymmetric key pair, party A broadcasts the same encrypted data stream to all the recipients regardless of the identity or the number of the recipients. Unauthorized recipients are not allowed to open the seal at the security server, and without the appropriate permit, unauthorized recipients are unable to decrypt the encrypted data stream broadcast by party A.

The method described above solves the broadcast key distribution problem. However, the method works only if all the recipients receive the data stream from the beginning because the recipients who begin to receive the data in midstream cannot decipher the data stream since the seal is sent only once at the beginning of the data stream. To solve the problem caused by recipients receiving data from midstream, in accordance with this invention, the same seal is sent periodically in the data stream.

8

FIG. 4 illustrates a method for efficient synchronization of keys for streaming media such that a recipient can begin decrypting the encrypted stream at selected points in the stream. Streaming media is typically employed for large multimedia files, where a client downloads a portion of a file, decompresses that portion and starts playing the contents, e.g., audio/video, before the rest of the file arrives. Subsequent portions of the multimedia file are downloaded while the previously downloaded portion is playing.

In accordance with this invention, data stream 400 is divided into data sections 401 through 404. Each data section 401 through 404 has a corresponding seal and a corresponding offset value indicating the offset with respect to the starting point of data stream 400, appended to the head of the data section. The offset values enable the recipients to determine where in data stream 400 the decryption begins so that at least a portion of data stream 400 can be decrypted. This is opposed to the method where the seal is only sent once at the beginning of the message, in which case if the beginning of the message is missing, the entire message cannot be decrypted. In an embodiment where the message is re-sent or sent more than once, sending seals periodically along with an offset value prevents the same portion of data stream 400 to be reused, i.e. decrypted more than once.

FIG. 5 is a flow chart illustrating an embodiment of the present invention, in which seals that have been opened previously are cached and stored in a local seal cache at the security client (e.g., application server and application client) so that multiple copies of the same seal do not have to be opened at the security server each and every time a seal is received by a security client. When the same seal is broadcast at various times, for example, when a seal is sent periodically in the data stream, as described in conjunction with FIG. 4, a recipient may receive multiple copies of the same seal. One method is to open the seal at the security server each and every time a seal is received by a security client. However, opening the seal at the security server every time a seal is received uses an unnecessary number of transactions to the security server if the same seal is received by a security client multiple times. To operate the system more efficiently, the same seal can be used multiple times but only opened once, by caching the seals that were opened previously.

In step 500, the sender broadcasts a seal to a number of recipients. Each recipient compares the received seal with the seals that have been previously opened and stored in a local seal cache at the recipient (step 504). The local seal cache stores seals that have been opened and also their corresponding permits. In other words, the local seal cache contains seal/permit pairs. The local seal cache can be of any memory size, depending on the size of the seal/permit and the number of seal/permit pairs the user would like to store. The received seal is compared using, e.g., a byte-for-byte value comparison method. If the received seal matches one of the seals stored in the local seal cache (step 506), a corresponding permit is returned from the local seal cache to the recipient (step 508). However, if the received seal does not match any of the seals stored in the local cache, the seal is sent to the seal open routine at the security server (step 510). The security server decrypts the seal and compares the recipient's identity against the policy to determine whether the recipient is authorized (step 512). If the recipient is not properly authorized (step 512), the procedure returns to the beginning to await for another seal to be sent from a sender.

On the other hand, a permit is extracted from the seal if the recipient is properly authorized (step 514). A newly opened seal and its corresponding permit are stored in the local seal cache (step 520) if it has been determined that the seal cache

US 7,743,249 B1

9                                                                                    10

is not full in step 516. If the seal cache is determined to be full (step 516), a least recently used seal and permit pair is deleted from the seal cache (step 518) before the newly opened seal and its corresponding permit are stored in the local seal cache (step 520). The permit is then returned from the seal cache to the recipient (step 508). By using a local seal cache, the system operates more efficiently because the same seal does not need to be opened multiple times by the security server.

FIG. 6 shows a seal appended to each data packet for a datagram communication. The majority of network security protocols gear toward connection-oriented protocols, e.g., transmission control protocol ("TCP"), because of the unreliable mechanism associated with internet protocol ("IP") for transferring data between two computers. TCP/IP provides a reliable stream of data that is in the exact sequence generated by the source. TCP/IP accomplishes this by breaking the data stream into packets small enough to fit inside IP datagrams which are numbered and sent using an acknowledgment-with-retransmission paradigm, meaning that the receiver sends an explicit or implicit acknowledgment for each IP datagram. The sender waits for some time and then retransmits the IP datagram if it does not receive an acknowledgment. In this scheme, the source port and the destination port must be identified prior to transmission of a data stream.

The minority few cater to datagram communication such as User Datagram Protocol (UDP). UDP is a connectionless datagram protocol and has certain advantages over a connection-oriented protocol such as TCP/IP. For example, in a datagram communication, every packet of data is sent individually from the source to the destination. No connection, e.g., handshaking mechanism, is required for sending a datagram packet. However, the UDP protocol is unreliable because there is no guarantee that a sent packet will arrive at its destination. There is also no guarantee that packets will be received in the same order they are sent. Therefore, UDP encryption either relies on long term host-pair keying or imposes a session-oriented protocol. In addition, setup is needed to establish a shared key.

The present invention provides a simple technique to secure datagram communication without the extra setup in establishing a secure session, wherein a seal is appended onto each individual datagram packet, as shown in FIG. 6. For example, seal 602 is appended onto datagram packet 601; seal 604 is appended onto datagram packet 603; and seal 606 is appended onto datagram packet 605. By allowing each datagram packet 601, 603, 605 to have its own seal 602, 604, 606, respectively, the order in which the datagram packets are received becomes irrelevant because no handshake or synchronization between the sender and the receiver is required. Similarly, a lost datagram packet does not impact the communication or the encryption integrity for the rest of the packets because every packet has its own seal and encryption/decryption for each packet can be accomplished individually and independently from the other packets. Hence, a seal appended to each datagram packet effectively eliminates the need for a connection setup, e.g., synchronizing encryption/decryption keys.

FIG. 7 illustrates a duplex transmission utilizing seals. In conventional cryptography, the exchange of keys between two communicating entities involves some form of handshake mechanism in which a shared symmetric key is exchanged. The handshake mechanism creates extra overhead which in turn incurs significant time penalties for time critical applications such as teleconferencing. FIG. 7 illustrates a data stream 700 where a seal 704 is appended to the head of data section 702, sent from a first party. Another data stream 706 having a seal 710 appended to the head of data

section 708 is sent from a second party. The appending of a seal to the head of a data section allows full duplex communication without the initial exchange of keys, thus avoiding associated costs.

When data section 702 with the appended seal 704 is received at the second party, the second party sends the seal to the security server to be opened. The security server then returns a permit if the second party is an authorized client. The second party can then generate a decryption key from the permit and decrypt the received data 702. Similarly, when data section 708 with the appended seal 710 is received at the first party, the first party sends seal 710 to the security server to be opened. The security server returns a permit extracted from seal 710 if the first party is authorized. The first party then uses the returned permit to generate a decryption key which is then used to decrypt the received data section 708. No synchronization between the first party and the second party is required because the data from each party has its own seal. Furthermore, no handshake protocol is required since no key exchange is required between the first party and the second party.

Although the invention has been described with reference to particular embodiments, the description is illustrative and not limiting. Various other adaptations and combinations of features of the embodiments disclosed are within the scope of the invention as defined by the following claims.

What is claimed is:

1. A system for securing a document stored in a computer system which is part of a network, comprising:
   a storage device storing a seal for association with a document which is to be stored or shared within the computer system or network, said seal comprising;
   a) information identifying a requestor requesting that the document be secured; and
   b) information identifying one or more parties qualified to access the document.

2. The system as in claim 1 wherein said seal further comprises a unique key.

3. The system of claim 2 further comprising means for allowing said key to be used by the requestor to encrypt the document.

4. The system of claim 3 further including means for allowing the requestor to discard the key following the encryption of the document.

5. The system of claim 4 further including means for allowing one or more parties to have access to the document in accordance with the information in the seal.

6. The system of claim 1 further comprising means for adding policy to the seal in the form of control information.

7. A method for sealing and controlling access to a document in a computer system which is part of a network which comprises:
   creating a seal which remains associated with the document when the document is anywhere within the computer system or network;
   placing in the seal information identifying a requestor requesting that the document be secured; and
   placing in the seal information identifying who can one or more parties qualified to access the document.

8. The method of claim 7 further comprising including in said seal information which allows the computer system to identify the name of the document.

9. The method of claim 7 further comprising including in said seal hash information from the document which allows the computer system to check the integrity of the document.

US 7,743,249 B1

11

**10.** The method of claim 7 further comprising including in said seal information which allows the computer system to identify who, whether an individual, hierarchy or group, can access the document.

**11.** The method of claim 7 further comprising including in said seal information which allows the computer system to identify time or other constraints for access to the document.

12

**12.** The method of claim 7 further comprising including in said seal information which allows the computer system to time stamp the document.

**13.** The method of claim 7 further comprising including in said seal information which allows the computer system to confirm server identity.

\*    \*    \*    \*    \*